## SPRING COAL CO. v. KEECH et al.

(Circuit Court of Appeals, Fourth Circuit. December 21, 1916.)

No. 1435.

CORPORATIONS ☞568—INSOLVENCY AND RECEIVERS—DISTRIBUTION OF ESTATE
—INTEREST.

Under the general principles of equity in the administration of the estate of an insolvent corporation through a receivership, where there are claims of different rank, the holders are entitled to interest until the time of payment, even though the holders of claims of inferior rank may receive no dividend at all; and this is especially true where the right to such interest during a receivership is expressly given to a prior lienholder by his contract.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2288, 2289; Dec. Dig. ☞568.]

Appeal from the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Suit in equity by Thomas T. Boswell and others against the Big Vein Pocahontas Coal Company. From an order confirming report of Edward P. Keech, Jr., and Harry H. Heiner, late receivers, the Spring Coal Company, intervener, appeals. Affirmed.

Charles C. Bucknam, for appellant.

W. H. De C. Wright and Robert R. Carman, both of Baltimore, Md., for appellees.

Before KNAPP and WOODS, Circuit Judges, and JOHNSON, District Judge.

JOHNSON, District Judge. The Big Vein Pocahontas Coal Company was a corporation organized under the laws of West Virginia and owned coal property and operated it in the state of Virginia. On May 1, 1909, the said company by indenture conveyed certain of its property to the Colonial Trust Company, a Maryland corporation, as trustee, to secure the payment of an issue of 6 per cent. sinking fund gold coupon bonds, par value $1,000 each, aggregating $400,000. Of these, bonds of a par value of $275,000 were issued and outstanding on October 28, 1910. Of the outstanding bonds, $212,000, were held by bona fide purchasers for value and $63,000 were held by creditors as collateral security for various loans and obligations of the company. On October 28, 1910, Thomas T. Boswell, Andrew C. Snyder, and Merville H. Carter, creditors and bondholders, on behalf of these and all other creditors and security holders, filed a bill in equity against the said Big Vein Pocahontas Coal Company in the United States District Court for the Western District of Virginia. The bill alleged the present inability of said company to meet its obligations. Paragraph 17 said:

"Your orators verily believe and therefore aver that the property and assets of the defendant coal company far exceed in value the amount of its indebtedness, provided its integrity is maintained and its operation continued, and

the dissipation, loss, and waste which would inevitably result from the levy-ing of execution upon the same prevented."

Continuing, the complainants set forth the great value of the company's property, and the importance of keeping it in operation as a going concern, in order that it might be sold for its fair value. They continued to aver:

"Your orators confidently believe and therefore aver that within a comparatively short time either a reorganization of the financial affairs of the defendant coal company can be effected or a sale of its property made upon terms which will satisfy all said creditors and security holders, but in order to bring about such a result, and to prevent the dissipation and waste of the assets of the defendant coal company, it is absolutely necessary that this honorable court should interpose and by its receiver or receivers take possession of all the property and assets, both real and personal, of the defendant coal company, with leave and direction to continue to operate the same and with power and authority to borrow money."

Upon the filing of this bill the court appointed receivers, and authorized and directed the receivers to take possession of the property of the defendant company, and to operate the same under the terms of the order then issued, or under such orders as might thereafter be issued by the court. On November 4, 1910, the Colonial Trust Company, trustee, filed an intervening petition in the said District Court, reciting the facts relative to the issue of the bonds issued under the deed of trust of May 1, 1909, alleging default in regard to the same, together with the request of the bondholders that the trustee file a petition of intervention. The trustee further stated that it was willing to adopt and be bound by the averments of the bill of complaint filed by the complainants, and prayed that it be admitted as a party plaintiff in the proceedings. On November 10, 1910, such petition of the trustee was allowed, and it was made a party plaintiff in the proceedings, and will therefore be considered one of the petitioning creditors.

The property was operated by the receivers from the 28th day of October, 1910, until the date of the sale on December 31, 1914. The profits of the mining department alone amounted to $282,465.31. It thus appears that the defendant company was operated with very great success and with very large profits by the receivers. During the time of operation of the property by the receivers, certain litigation was going on with the Brownings in regard to the amount due by the company as purchase money.

The decree of sale provided among other things as follows:

"In case said parcel No. 1 be purchased by any holder of the bonds of the defendant coal company, he shall have the option and right to make payment for the said parcel No. 1 in the said bonds or coupons, or both, any such bonds or coupons thereon shall be receivable in payment as cash for the amount of such dividend or distribution as will be payable to the same out of the proceeds of the sale of parcel No. 1."

The property was purchased by a committee of the bondholders for $350,000, and in payment thereof they deposited with the court bonds and matured coupons thereon to the amount of $273,000, and the remainder of the purchase money was paid in cash or its equivalent.

239 F.—4

Article 16 of the deed of trust hereinabove referred to provided:

"In case the coal company make default in the payment of principal or interest of the coupon bonds, the trustee shall personally or by duly constituted agents or attorneys in 'the premises take possession of, manage, and control the same and receive the income, rents, issues, and profits thereof until such time as each and all of said bonds then outstanding and all coupons thereon then matured or which shall mature and become payable during the possession of said real and personal property by the trustee, its agents, or attorneys shall have been paid, in which case the trustee shall apply any money arising from the operation of said real estate or personal property first to the expenses of the trust, etc.; second, to the payment of the matured and maturing interest coupons on said bonds then outstanding; and thereafter to the payment of the principal sum of said bonds."

It was further provided that in case any sale of the real and personal property conveyed be made in pursuance of the terms. of the deed of trust, or in the course of foreclosure or any other proceedings for the enforcement of the trust, the proceeds of the same together with any income arising from said real or personal property in the hands of the trustee or of any receiver or other officer of the court should be applied as follows: First, to the payment of costs, etc.; second, to the payment of the whole amount of the principal and matured interest and interest upon overdue interest.

The Spring Coal Company filed its petition of intervention and appealed from the order confirming the report of the receivers. Some question is made in the argument to the effect that the decree of sale which provided that the bonds and the interest thereon could be deposited by the purchasers was final, and that the appeal should have been taken from that decree and not from a formal order of the court confirming a report of the receivers. We prefer to put that question to one side, and to meet the real question presented by this appeal upon its merits, and that is: Were the bondholders entitled to interest on the coupons that matured from October 28, 1910, when the receivers were appointed until the sale of the property on December 31, 1914?

The appellant contends that when the receivers were appointed the property passed into the custody of the court, which was equivalent to the equitable levying of an execution in behalf of all the creditors in proportion to their claims upon the funds in the hands of the court, and that any delay incident to the administration of the estate is the delay of the court and not the default of the debtor and that all interest ceased from the time the court took charge of the property. Numerous authorities are cited to sustain this proposition. We have examined all the cases cited from the decisions of the United States courts. There are three classes of cases referred to. Quite a number of cases arising out of the settlement of insolvent national banks are cited. Such cases have no application to the case in hand. In the case of Cook County National Bank v. United States, 107 U. S. 448, 2 Sup. Ct. 561, 27 L. Ed. 537, the court said:

"We consider that act (National Banking Act) as constituting by itself a complete system for the establishment and government of national banks. * * * Everything essential to the formation of the banks, * * * the

winding up of the institutions, and the distribution of their effects, are fully provided for, as in a separate code by itself, neither limited nor enlarged by other statutory provisions with respect to the settlement of demands against insolvents or their estates."

It follows, therefore, that all the cases arising out of the settlement of insolvent national banks have been settled according to the courts' construction of the national banking act and not in accordance with the general principles of equity.

Many cases are cited by appellant which arose under the Bankruptcy Acts. The Supreme Court in Bank v. United States, 107 U. S. 452, 2 Sup. Ct. 567, 27 L. Ed. 537 referring to the Bankruptcy Act of 1867 (Act March 2, 1867, c. 176, 14 Stat. 517) said:

"That enactment was dealing with the estates of persons adjudged to be insolvent under that law and covers only the distribution of their estates. It has no further reach."

All the bankruptcy cases referred to arose either under the act of 1867 or the Bankruptcy Act of 1898 (Act July 1, 1898, c. 541, 30 Stat. 544), and they are settled by the courts' construction of the provisions of the bankruptcy laws, and have no reference to the general principles of equity jurisprudence.

Eliminating the authorities arising under the statutes referred to, we come now to the broad question as it arises in the settlement of insolvent estates according to the general principles of equity. Courts of equity no more than courts of law have power to make contracts for persons or corporations, nor can courts substitute their judgment for the judgment of the parties to a contract. It is the duty of courts to construe and to enforce valid contracts as the parties made them. A careful reading of all the authorities will show that this principle has not been departed from. The fact that courts of equity have allowed certain claims priority over lien debts has sometimes erroneously been construed to mean that courts had exercised a power to modify or change a contract. The basis of such an allowance, however, is found in the fact that property in the custody of the court must be preserved for the benefit of the creditors, and the cost of such preservation must, of course, be borne by the property itself. For example, the court might borrow money to insure property covered by lien, and the cost of such insurance would have priority over the lien debts. If cases have gone beyond this and violated this principle, it seems to us that they have gone further than the court had any right to go.

We do not understand that the courts have ever declared that interest upon contracts which provided for interest must stop in any and all events when property passes into the hands of the court. That is a rule adopted by the court for its convenience in the distribution of insolvent estates and when all claims are of equal rank or dignity. When the estate is insolvent, it is immaterial to the creditor whether the dividend is calculated on the basis of the principal alone, or of the principal and interest combined. But where there are debts of different rank or dignity, this general rule does not apply. Mr.

Justice Lamar, in the case of the American Iron Co. v. Seaboard Air Line Railway, 233 U. S. 261, 34 Sup. Ct. 502, 58 L. Ed. 949, said:

"Principal as well as interest, accruing during a receivership, is paid on debts of the highest dignity, even though what remains is not sufficient to pay claims of a lower rank in full"—citing Central Co. v. Condon, 67 Fed. 84, 14 C. C. A. 314;*Richmond v. Richmond Railroad Co., 68 Fed. 105, 15 C. C. A. 289, 34 L. R. A. 625; First National Bank v. Ewing, 103 Fed. 168, 43 C. C. A. 150.

In the case of Central Trust Co. v. Condon, 67 Fed. 84, 14 C. C. A. 314, Circuit Judge Taft, in delivering the opinion of the court, said:

"This is not a case where the distribution is to be made pro rata between the lienholders and the bondholders, in which case, of course, interest is not to be calculated upon the claims after the time of the sequestration of the property for sale and distribution, so long as the claims cannot be paid in full"—citing Bank v. Armstrong, 16 U. S. App. 465, 8 C. C. A. 155, and 59 Fed. 372. "In the distribution of the proceeds of a common security between liens of different priorities, we know of no principle by which interest can be stopped on the amount of the superior lien until its satisfaction. As between the bondholders and the lienholders, the lienholders are entitled to interest to the day of payment."

In the case of Richmond Construction Co. v. Richmond Railroad Co., 68 Fed. 105, 15 C. C. A. 289, 34 L. R. A. 625, Mr. Justice Lurton, delivering the opinion of the court, quotes Mr. Justice Matthews as saying:

"Where it [interest] is reserved expressly in the contract, or is implied by the nature of the promise, it becomes part of the debt, and is recoverable as of right; but, when it is given as damages, it is often matter of discretion."

Continuing in his own language, the justice said:

"In Thomas v. Car Co. [149 U. S. 116, 13 Sup. Ct. 824, 37 L. Ed. 663], heretofore cited, there seems to have been no definite time agreed upon as to payment, and interest was disallowed because, as the court said, the delay in payment 'was occasioned by resisting demands made by the car company, which the result of the litigation shows were excessive, if not extortionate.' The contract company was in default, and interest is properly allowable from the time it failed to pay according to its promise, by way of compensation for the delay in payment. Neither is there anything in the fact that the railroad company is insolvent, nor in the fact that the allowance of interest will diminish the fund to which the bondholders may look for the payment of their bonds. The language relied upon in support of the decree disallowing interest, from the opinion in Thomas v. Car Co. that 'as a general rule, after property of an insolvent passes into the hands of a receiver, or of an assignee in insolvency, interest is not allowable on the claims against the funds,' was not a point upon which that case turned, and was doubtless intended to apply only to a case where the fund is insufficient to pay all, and the creditors are all of the same rank. * * * This is not a case of the distribution of an insufficient fund among lienors of the same rank. The lien claims of the subcontractors are by the statute preferred over the mortgage, and the bondholders are entitled only to that which remains after senior liens are satisfied. If interest is properly due, as between creditor and debtor, the interest is just as much a part of the principal claim as the principal thereof."

In the case of First National Bank v. Ewing, 103 Fed. 190, 43 C. C. A. 150, the court, after referring to the case of Thomas v. Car Co.,

which has been so often quoted in cases of this kind and which has not always been read in its proper meaning, said:

"The general rule announced by the Supreme Court is applicable to the cases where the fund is to be shared by creditors without liens, or by those having liens of equal and common rank, but where there are claims of several classes with liens of different priorities, the holders thereof are entitled to interest down to the date of the decree."

Mr. Justice Lamar, in the case supra, said:

"Manifestly, the law does not contemplate that either the debtor or the trustees can, by securing the appointment of a receiver, stop the running of interest on claims of the highest dignity."

In the case now under consideration the deed of trust not only secured the payment of the principal of the bonds, but it specifically provided that in case of receivership, the profits arising from the operation of the mine should be applicable to the interest due or to become due during the receivership, indicating clearly as language can the intention of the parties that the bonds should bear interest in case of a receivership. Under the terms of the contract, it was not only in the contemplation of the parties that the bonds should bear interest during the receivership, but such interest was made a lien, not only on the property included in the deed of trust, but upon proceeds from the operation of the property. This application was not made. The $282,000 of net profits which accrued from the operation of the mines was applied to preferred claims upon the real estate, but not to the preferred claims upon the profits arising from the real estate. That inured greatly to the benefit of nonlien creditors. As the property embraced in the deed of trust sold for a sum exceeding the principal and interest, the holders of the bonds and the coupons thereto attached are entitled to be paid in full, not only according to the terms of the contract, but, as we believe, under the general principles of equity. It would be highly inequitable to deprive lien creditors of interest for more than four years, while the mines were profitably operated for the benefit of the nonlien creditors.

The case most generally referred to is the case of Thomas v. Western Car Co., where the court said:

"As a general rule, after property of an insolvent passes into the hands of a receiver, * * * interest is not allowed on the claims against the funds."

The court then proceeded in that case to deny the car company interest upon its claim and said:

"We see no reason in departing from this [general] rule in a case like the present, where [the claim for car rentals] will be paid out of moneys that fall short of paying the mortgage debt."

We think a careful reading of all the authorities will show that where estates are insolvent and all the claims are of like dignity, the court declares the dividend upon the basis of the amount of principal due at the time the property passed into the hands of the court,

because it is immaterial whether the dividend is calculated upon the interest and principal combined, or the principal alone; but where there are claims of different classes, and one is secured by a mortgage of real estate, the holder of such mortgage is entitled, not only to the principal, but to the interest that accrues up to the time of satisfaction, even though nonlien creditors may not receive any dividend at all. This must be so if the court enforces contracts as parties made them. It is especially true when the court retains control of the property upon which there is a specific lien and operates that property for a long period of time at great profit for the benefit of nonlien creditors. The lower court did not err in allowing interest on the bonds during receivership. Its judgment should be affirmed.

Affirmed.

⬗For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes